# THE STATE v. EMORY GRUBB and RILEY ASHER, Appellants.

## Division Two, March 5, 1907.

1. **VENUE: Stolen Property: Transferring Cause: Evidence.** The court did not err in refusing defendant's request to stop the trial in Dent county and transfer the cause to Crawford county on the ground that the cattle charged to have been stolen were shown to have been in defendants' possession in Crawford county, when all the testimony tended to show that the pasture from which the cattle were taken was wholly in Dent county, that it was inclosed with a barb-wire fence which was kept in good condition and inspected two or three times a week, and that when the cattle were first seen in defendants' possession in Crawford county, they were being driven by them from the direction of this pasture.

2. **EVIDENCE: Larceny: Defendant's Statements.** No error was committed in permitting a station agent to relate a conversation he had with one of two defendants charged with the larceny of cattle, in which the agent asked defendant why he did not use all three of the cars ordered for the shipping of the cattle, and defendant answered that he had three car loads of cattle, but one car load had stampeded and got away from him.

3. ——: ——: **Explaining Possession of Stolen Property: False Statements.** Where the evidence shows that defendants explained their possession of the cattle charged to have been stolen, by stating that they had bought them from certain parties, it was competent for the State to show by such parties that they had not sold any cattle to defendants.

4. ——: ——: **Identifying Defendant.** No error was committed in allowing the State to prove by a bank cashier that he knew all the stockmen in the community and did not know of any stock man, or any man, of the name given by defendant, who claimed to be a stock man.

5. ——: **Handwriting: Comparison Invited by Defendants.** Where defendant, on cross-examination of the State's witnesses, invited a comparison of his handwriting on different papers, he cannot complain if counsel for the State further interrogated the witnesses along the same line.

6. **WITNESS: Reputation: Impeachment.** The court properly restricted the impeachment of a witness to his reputation for truth and veracity, and excluded evidence as to his reputation for being a dead-beat.

7. **REMARKS OF COUNSEL: Failure of Defendant to Testify.** Remarks of counsel can not be construed as a reference to defendant's failure to testify where both defendants have testified in their own behalf, and as stated by counsel in their brief, "to the facts involved in the whole case."

8. ————: ————: **Discussing Evidence: Calling for Explanation.** The statute (sec. 2638, R. S. 1899), prohibiting any reference to a defendant's failure to testify, does not prohibit an attorney in his argument from discussing the evidence and calling for an explanation of the conduct of defendants who have testified—in this case stating that it was strange that a trip shown by the evidence to have been taken by defendants to the scene of the crime, had not been explained.

Appeal from Dent Circuit Court.—*Hon. L. B. Woodside*, Judge.

AFFIRMED.

*Frank H. Farris* and *Harry Clymer* for appellants.

(1)   The offense must be prosecuted in the county in which it was committed. R. S. 1899, sec. 2406; State v. Anderson, 191 Mo. 134. And the venue is a question of fact, and must be proven by the State, the same as every other necessary averment in the information.    State v. McGinnis, 74 Mo. 245; State v. Hartnett, 75 Mo. 251; State v. Inman, 76 Mo. 649; State v. King, 111 Mo. 576; State v. Hottle, 104 Mo. App. 34.   While it is true that the venue need not be proven by direct and positive evidence, yet it can only be inferred when the facts and circumstances proven support such inference and the jury could, from all the evidence, reasonably find the venue as charged. State v. Sanders, 106 Mo. 195.   It cannot be claimed that the testimony in this case will support such inference. No injury could have resulted to the State by reason of the failure to prove the venue in Dent county, as sections 2414 and 2415, Revised

Statutes 1899, make ample provision for such conditions as arose in this case, by authorizing the trial court to transfer the cause to the county in which the venue has been proven, namely to Crawford county, and this the defendants asked the court to do, and objected and excepted to the court's refusal. (2) The court erred in admitting evidence: (a) Of Cleary, the station agent, as to a conversation with Emory. (b) Of Corkran and Ives, that they did not sell any cattle to defendants. (c) Of Holt, the bank cashier, that he knew no man by the name of Emory. (3) The court erred in refusing defendants the right to offer impeaching testimony as to the general reputation of witness Collins as a citizen, as a dead-beat, and for being an honest, upright law-abiding citizen. State v. Clinton, 67 Mo. 380; State v. Cushenberry, 157 Mo. 184; State v. May, 142 Mo. 150; State v. Raven, 115 Mo. 423; State v. Grant, 79 Mo. 133; State v. Reder, 95 Mo. 486; State v. Miller, 71 Mo. 590; State v. Pollard, 174 Mo. 618. (4) Section 4679, Revised Statutes 1899, is the law authorizing the comparison of handwriting, and fixes the rule by which such comparison may be made. And the most liberal construction of this section cannot authorize a comparison of a disputed writing with the admitted writing of a person other than the one charged to have made the writing in dispute. State v. Thompson, 141 Mo. 408; Bank v. Hoffman, 74 Mo. App. 204; Cook v. Strother, 100 Mo. App. 622; Sanders v. Loan Ass'n, 178 Mo. 674; People v. Molineux, 62 L. R. A. 291. (5) The court erred in permitting special counsel for the State and the prosecuting attorney to go outside the record in the argument in making the statements set out in the bill of exceptions, without rebuke. State v. Spivey, 191 Mo. 112; State v. Snyder, 182 Mo. 523; State v. Elmer, 115 Mo. 401; State v. Fairlamb, 121 Mo. 150; State v. Grimm, 174 Mo. 686; State v. Groves, 95 Mo. 513.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) The proof that the alleged larceny was committed in Dent county was sufficiently strong. On that subject this court said: "But the question of venue or jurisdiction is always a question of fact, and may be proved like any other fact. If the evidence raises a violent presumption that the offense for which the prisoner is indicted was committed in the county where he was tried, it is sufficient. 1 Whart. Cr. Law, sec. 601. We cannot discover any such error as would justify us in disturbing the verdict." State v. Burnes, 48 Mo. 440; State v. Chamberlain, 89 Mo. 129; State v. West, 69 Mo. 404; State v. Sanders, 106 Mo. 195; Underhill on Crim. Evid., sec. 36. "But the venue may be inferred from circumstantial evidence, as well as proved by direct evidence." 4 Elliott on Evid., sec. 2714; Wharton on Crim. Ev., sec. 108. (2) No error was committed by the trial court in permitting State's witness Cleary to testify in regard to the three cars that the defendant had ordered, to the fact that defendant only had two car loads of cattle, and to the statement made by defendant that the third car load stampeded and got away from him. (3) (a) Neither was error committed in permitting State's witness William Corkran to testify that he did not sell any cattle to defendants in June, 1904. Hinshaw v. State, 147 Ind. 362; Walker v. State, 49 Ala. 400; People v. Arnold, 43 Mich. 305; 4 Elliott on Evidence, sec. 2723; State v. Benner, 64 Me. 289; State v. Dickson, 78 Mo. 448; State v. Ferguson, 162 Mo. 678; Wills on Cir. Ev., pp. 80, 81. (b) No error was committed in permitting State's witness Ives to testify that he did not sell the defendants any cattle branded with a horse shoe in June, 1904. Defendants' objection was properly overruled for the further reason that defendants' counsel assigned no reason for their said objection. But said

evidence was proper, as it tended to identify the defendants as the persons guilty of the larceny of these cattle. State v. Walker, 194 Mo. 253. (4) The evidence of State's witness Holt, to the effect that he did not know any man in or around St. James by the name J. D. Emory, was properly admitted. Mr. Holt had previously testified that he was cashier of the bank at that place and was well acquainted with all of the stockmen in and around there. (5) No error was committed in refusing defendants the right to offer further testimony tending to impeach State's witness Collins. Defendants proved by their witness Watson that Collins' general reputation for truth and veracity and also for honesty was bad. Not satisfied with this, they asked Watson in regard to Collins' general reputation for being a dead-beat; but the State's objection to this question was sustained. The ruling of the trial court on this subject was correct. (6) By referring to the testimony of State's witness Dent, the banker, it will be seen that the prosecuting attorney asked him to compare the signature to the live stock contract with the signature to the bond; and the witness testified that in his opinion both signatures were written by the same person. Nothing whatever was asked him about the signature to the check. But on cross-examination, defendants' attorney asked the witness to compare the signature to the bond with the signature to the check. The witness did so, and gave it as his opinion that the signatures were different. If error was thereby committed, it was self-invited error, and error of which the defendant has no right to complain. State v. Hamey, 168 Mo. 197; State v. Palmer, 161 Mo. 175; Stalzer v. Dodd Pac. Co., 84 Mo. App. 574.

GANTT, J.—This is an appeal from the circuit court of Dent county, Missouri. On September 11, 1905, the prosecuting attorney of that county filed an information charging Emory Grubb, Riley Asher and

George Grubb with grand larceny in said county on the —— day of June, 1904, in that they took, stole and carried away forty head of neat cattle, to-wit, ten head of red colored steers about three years old, ten head of red colored steers about two years old, and ten head of red colored steers about five years old, of the value of twelve hundred dollars, of the goods and chattels of the Sligo Furnace Company, a corporation organized under the laws of the State of Missouri. At the October term, 1905, the State dismissed the case as to George Grubb and he was discharged, and at the same term the defendants Emory Grubb and Riley Asher were put upon their trial and convicted. After ineffectual motions for new trial and in arrest of judgment, they were sentenced to the penitentiary in accordance with the verdict of the jury. From that sentence they appeal.

The testimony on behalf of the State tended to establish that the Sligo Furnace Company was a corporation duly organized under the laws of the State of Missouri, and that it owned a pasture in Dent county, Missouri, which contained 2,700 acres, situated near the town of Sligo in the northern part of Dent county. This pasture was surrounded by a barb-wire fence, and the company was in the habit of taking cattle each year to graze. In April and May, 1904, some three hundred steers were placed in this pasture in charge of James Cooksey as manager and superintendent thereof. Cooksey visited the pasture about three times a week, salted the cattle and looked after the fence. It was his duty to solicit stock for the company for grazing. In April and May, 1904, stock belonging to A. J. Glassey, J. W. Glassey, Ed. Mitchell, Chas. Matlock, Nathan Whites and George Bell was placed in this pasture. Some of these cattle were branded with an O, some with C, some with Q, some with G, and some with U. They were two years old, three years old, four

years old and five years old, all red and all dehorned. In October, when the cattle were rounded up to be taken out of the pasture, it was discovered by Cooksey and the owners of the cattle, that fifteen of Bell's cattle and thirty-eight of Glassey's cattle were missing. Thirteen of Bell's cattle were large steers and two were small yearlings. The Glassey cattle were bigger and older, most of them being three and four years old. All of the missing cattle were gentle; fifteen of these cattle were afterwards found northeast of the Sligo pasture in Crawford county, some of them a mile away and others as far as ten miles from the pasture. The cattle were worth from twenty-five to twenty-seven dollars and a half per head. One heifer was kept in the pasture with the steers; she was three or four years old, red with a white face, weight about one thousand pounds. About the 20th of June, 1904, Cooksey discovered the tracks of two horses inside of the pasture near the north fence. These tracks were made by small horses, one smaller than the other. Near where these horse tracks were found, Cooksey discovered that the barb-wire fence had been cut and the horses' tracks went out through this opening thus left in the fence. This cut was in the fence on the north side and near the northeast corner of the pasture, the corner next to Scott Parrott's place, which was five or six miles away. In May and June, Herman Essman was engaged in the livery business in Steelville, Crawford county, Missouri. He testified that in May or June, he was not certain as to the date, but it was not later than June, the defendant Grubb and another man drove to Steelville in a buggy and sent the buggy back by the driver, and hired two horses from him, Essman. The defendant Grubb applied to witness Essman for two saddle horses, saying that he wanted them for three days, that he was going to Sligo, and Essman hired him two small bay horses, one of which was a mare with a

white star in her face. Defendant Grubb paid for the horses in advance, and he and his companion left together on horse back, going in the direction of the town of Sligo, leaving Steelville at nine o'clock a. m. About one o'clock a. m. of the third day thereafter, these horses were returned to Essman's barn, by a man whose name, he thought, was Asher. This man was not as large as the defendant Grubb, and wore a black mustache. The horses were tired when they were returned, and one of them had a sore back and sore withers.

J. W. Conway testified that he lived about three miles or three and a half miles from this Sligo pasture in June, 1904, and he knew the defendant Emory Grubb by sight. On the 6th day of June, 1904, a relative of his, Mrs. Arna, was buried, and after the funeral, he was sitting on the porch of his residence, and his wife called his attention to some one coming up the lane with some cattle, and in a few minutes he saw the cattle coming with two men driving them; one of the men got ahead and he did not see him good, but he saw the defendant. They stopped the cattle beside his lot and the defendant stopped and looked at the witness and then motioned his hand to his companion, and they drove the cattle on. This was just after sundown and they were going down Dry Creek north in the direction of Scott Parrott's. He did not speak to these men, nor they to him, he identified the defendant Emory Grubb as one of the men to the best of his knowledge and belief. He thought there were something like forty or fifty head of cattle in the drove. They came from a southern direction and were going north, they were travelling on the neighborhood road. He was about twenty-five steps from the defendant and the defendant was on horse back. The other man was some eighty or one hundred yards from him, and was a smaller man according to his recollection.

Scott Parrott at that time lived about one mile north of Conway's place, and on the same county road, about six miles from the Sligo pasture. He had lived on this place with short intervals since 1869; his farm is about twenty miles from Leasburg. On the evening of the 6th of June, 1904, Parrott was at home with his wife and children. About sun-down that evening, a man calling himself J. D. Emory, a large, good-looking man, who carried himself up straight, and said he weighed one hundred and eighty pounds, accompanied by a smaller man of a dark complexion with a heavy mustache, came to his house with a drove of cattle. He identified both the defendants Emory and Asher as the men who came to his house that evening with the cattle. They reached his place about sun-down with the cattle and requested permission of him to put these cattle in his lot, saying they would stay with the cattle, and he requested them to stay with them on account of the fence being poor and he did not want them to get into his field and destroy his crops. They took supper with him and borrowed some blankets and made a bed to sleep in, in a small building close to the lot. He and they repaired the fence around the lot before they put the cattle into the lot, and by the time they got the fence repaired, it was dark. The cattle were three and four-year-old steers, some of them five years old, in good order, but not so very fat; the cattle were gentle; he noticed a lot of them were branded with O. In the lot was one Hereford cow with a white face, a nice-looking cow. The men gave their names as Emory and Brown. He had a conversation with Emory and a few words with Brown. Emory did the most of the talking, he seemed to be the boss, and paid the money for the use of the lot and ordered the supper and paid for the night's lodging. The man who called himself Emory, and whom the witness identified as Grubb, said

201 Sup—38

he got the cattle in Dent county, up near Stone Hill, from an old Irishman by the name of Corkran; he stated first that he got them from several parties, but the most of them from the old Irishman Corkran that lived close to Stone Hill. He said he lived out near St. James or Jamestown, and was taking the cattle to Leasburg. The defendant Grubb was wearing good clothes but his pants were badly torn and he requested Mrs. Parrott to lend him a needle and thread, which she did, and he tried to repair them. He said he was going to take these cattle to his uncle who lived, witness was not sure whether he said, in North Missouri or Illinois, but anyway he intended to take the cattle to a place where his uncle lived, and that his uncle had furnished him the money to buy them with, and that he was going to ship them at Leasburg. Defendant Grubb made several inquiries of Parrott in regard to the roads to Leasburg, and he directed him first to a road leading through Cherryville and Steelville, telling him that that was the best way, but the defendant Grubb said he did not want to go by Steelville, that he had rather go to the right of Steelville near Cherryvalley bank, that that would be his nearest road, and Parrott thereupon directed him about that road. The defendant inquired how far it was to Cherryville, and if there were any farms between Parrott's and Cherryville. Defendant then asked about Keysville and Davisville. Parrott did not have any feed at his place for the cattle and the defendant asked him which road would be best for these cattle to get good range, and the defendant said he would rather go through the open country than by the farms, that he wanted to get the cattle on the range as quick as he could, and was directed by Parrott to drive to the left, after he crossed the creek, and he would get into the range. The cattle were red and white spotted. Witness thought there were about forty head of the large cattle and the rest of them would be

smaller and younger. Defendant told Parrott that he
had come by old man Conway's, down by Dry Creek
or Sugar Hollow. This road was not a public road and
was about three or three and a half miles from Sligo
pasture. There was one or two heifers in the bunch
of cattle. There were other brands besides the O brand-
ed on the cattle; he noticed some of them were branded
with a G and C. These men requested his wife to get
them breakfast very early next morning, that if they
could not get it very early, they did not want any at all.
They left the next morning about day light. Defend-
ant Grubb stated that he had had no dinner that day.
They were riding good-looking horses, one a chestnut
sorrel and the other a bay. The chestnut had a white
star in the forehead. Defendant Emory rode a bay
horse. To Parrott's son Reuben, who suggested that
the heifer was marked with Gill Parrott's mark, a
round hole and a split out of the left ear, the man Em-
ory, or defendant Grubb, said he did not guess they
were Gill's cattle' that some of that man's cattle were
in the bunch, but they got them out. To the witness's
wife, they said they knew Gorge Day who lived in Cher-
ryville. Witness Parrott further testified that he was
a justice of the peace. These parties left one red and
one white spotted steer with Mr. Parrott, saying that
the steer got in with their cattle and followed them, and
they requested him to hold the steer an hour after they
left and then turn him out in the road and drive him
in the opposite direction. This Parrott did, but the
steer got away from him and followed the cattle. On
cross-examination, Parrott stated that some of the cat-
tle were branded with U's and X's. He stated that
when the men came to his house, it was day light,
perfectly light, and that the Sligo pasture was located
in Dent county, all of it in Dent county. On re-direct
examination he stated further that Mrs. Parrott wanted
to swap a cow that was breechy for the cow that was

in the drove of cattle, but defendant Grubb said he did not want to swap that cow, that she was a fine-blooded cow; that the defendants left with the cattle between three and four o'clock next morning. While eating supper, the defendant Grubb stated that he was going to ship the cattle in the name of J. D. Emory as Brown's name was rather a common one. Defendant Asher told Mrs. Parrott that he came from the South and had no relatives except a sister in Salt Lake City. Defendant Grubb stated to her he came from the northern part of this State and weighed 185 pounds.

Mrs. Parrott testified that it was sun-down when the defendants reached the farm with the cattle, and she corroborated her husband's testimony as to the time the men came and the putting of the cattle in the pen, and the color and brands of the cattle, and her attempt to trade her cow for the white-faced Hereford cow. She testified to hearing defendants say they must hurry up and get started on the road the next morning, that it would be late before they could get the cattle to the station. She testified that the defendant Grubb said he tried to stay with a man who was living near the creek, but he could not get to stay there, that at first her husband told him he had better try to get a more convenient place to keep his cattle, but he said he was afraid his cattle would give out. After they got the cattle in the lot, the small man began to stir them around to keep them from lying down, and she asked her son why it was they wanted to keep those cattle on the stir, and one of them said that they had been driven so hard and were so hot that they were likely not to get up if they lay down, and the small man said that they had put in the afternoon rapidly, and had not lost any time. He did not say exactly where they got the cattle only that they bought them from a man over towards the Meramec, and that he was an old Irishman. She asked them how far they had traveled that day, and

they did not give her a satisfactory answer. She heard the conversation of the defendant Grubb with her husband in regard to roads, and heard the defendant say he wanted to get to Leasburg without crossing very many farms, that they wanted to graze their cattle just enough to keep them from getting too hungry on the road. She recognized the defendant Grubb as the man who told her his name was J. D. Emory, and she thought the defendant Asher strikingly resembled the man Brown, who she saw at her house on the 6th of June.

Reuben Parrott, a son of Scott Parrott, testified that he was seventeen years old, and he remembered the men coming to his father's house on the 6th of June, with the cattle about sun-down, and he corroborated his father's and mother's testimony as to the brands on the cattle and their number, and the statement of the defendants that they got the cattle from Corkran. He identified the defendants Grubb and Asher as the men who gave their names at his father's house as Emory and Brown. He was with them in the lot and saw them at the supper table, and heard their conversation with his mother and father, and saw them at the breakfast table the next morning.

John West, a cattle trader living near Leasburg, remembered seeing forty head of cattle in the stock pens of that town about the 7th of June, 1904; thinking that he might be able to purchase them, he counted them; they were a mixed lot, two, three and four-year-old steers. He said he was well acquainted in Crawford county, and knew almost everybody in it and had never heard of a man by the name of J. D. Emory in that county. These cattle were most of them red cattle and was a good bunch of cattle for that country. He asked the man who was in charge of them where he got them, and he said east of Sligo. After the man said they were not for sale he turned and rode off.

P. E. Clounts testified that he lived down east of Steelville. In the month of June, 1904, he was living in Leasburg. Sometime in June, he could not say what the date was, there was a bunch of cattle driven into Leasburg. Two men were driving them; to the best of his recollection the horses they rode were bays, one might be called a black bay. These two men came into his store and wanted to buy some clothing, wanted to buy some pants, looked over the clothing, but they did not buy. They came to the store just after dark, after he had lighted up. He said the two prisoners Grubb and Asher looked very much like the men to him, but he could not be sure of it. The larger man who came to the store had no whiskers at all, but the smaller one had a mustache. He saw the cattle afterwards in the stock yards; they ran from two years old to five years old; he did not go through the cattle, but some of them were branded; he remembered that some of them were branded with an O, some of them looked like they were branded with a horse shoe, that was a U.

William Clounts testified that he lived ten miles east of Steelville, but in the month of June, 1904, he lived at Leasburg. Sometime about the 7th of June, 1904, he remembered some cattle being brought to Leasburg in charge of two men, one was a heavy set man and the other was a smaller man. The men came in the store and inquired for some pants, but did not purchase them. They reached Leasburg with the cattle about four or five o'clock; the cattle were a mixed lot and ranged from four years down to yearlings. Some were branded with an O, and some with brands he took to be horse shoes. He did not count the cattle; he had a conversation with one of the men, who told him that his name was J. D. Emory, and that he got the cattle out south of Leasburg. Witness asked him if he bought some of the cattle from George Ives, and the witness said, "I see his brand." Emory said he lived in

North Missouri. Witness afterwards saw him in a saloon; John Ives and Billy Fitzgerald were there at the time, he was not sure that Bill Redman was. Bill Fitzgerald and Herb Crabtree and the witness helped load the cattle onto the cars. This witness identified the defendant Grubb as the man who gave his name as Emory, and who had the cattle at Leasburg. He stated that he first saw the defendant Grubb at the store when he was talking about buying a pair of pants, and after that he saw him in the saloon. He states that he was in the saloon quite awhile, in fact, he would say from the time they met until they went down to the stock pens to load the cattle. He also identified the cattle as branded with the O's, and he could not remember the other brands.

G. W. Ives testified that he lived in Steelville, Crawford county, and had for forty-nine years. He testified that he never sold the defendant, Emory Grubb, or a man by the name of J. D. Emory, any cattle.

William Cleary testified that on the 6th, 7th and 8th days of June, 1904, he was the station agent of the 'Frisco Railroad Company at Leasburg, and received word by wire that three cars for cattle were wanted for a man named J. D. Emory. That night about dusk, he discovered that forty cattle had been placed in the stock pens at Leasburg. About nine o'clock on the night of the 7th of June, 1904, the defendant Grubb appeared at the office in the 'Frisco depot at Leasburg and told Mr. Cleary that his name was J. D. Emory, that the cattle belonged to him, and he wanted to sign up for the shipment. Cleary told him that the cars had not yet arrived but he was expecting them that night on the next train, number 36, between twelve and one o'clock that night. The defendant Grubb again appeared at the depot and Cleary prepared the written contracts of shipment and the de-

fendant Grubb signed the same, using the name J. D. Emory, and they were witnessed by Mr. E. C. Walls, an assistant in the freight office. Cleary had received an order for three cars, and this contract was made out for only two cars. The contract was signed in duplicate, and he saw the defendant sign the name J. D. Emory to the contract and the defendant had one of the copies and he retained the other. As the order was for three cars, Cleary asked him why he did not ship the third car, and the defendant said he had three car loads, but one of the car loads got away from him and stampeded. He said he drove the cattle through Steelville and one car load got away from him. Cleary sent Walls out to count the stock. The witness then identified the stock contract marked Exhibit E, which was signed that night by defendant Grubb by the name of Emory, which called for a shipment of forty head of cattle from Leasburg to St. Louis, Missouri, each head of the same estimated at a weight of seven hundred pounds, and valued at thirty dollars per head. Signed J. D. Emory, owner, witness E. C. Walls. This contract was dated June 8, 1904, and provided that the cattle should be delivered at the National Stock Yards, Illinois, and was in the usual form of stock-shipping contracts by a railroad company. This contract was read in evidence and was signed by Cleary as agent for the St. Louis & San Francisco Railroad Company.

E. C. Walls testified that he lived at Leasburg, Missouri, and had lived there about thirteen years, at the time he testified. He was telegraph operator for the 'Frisco Railroad Company at that point, and was working under Cleary. He identified his signature on the stock contract and also the signature of Emory. Witness asked him if J. D. Emory was his name and he said it was. He asked the defendant what his object was in shipping such cattle to the market and

the defendant said he was not shipping them to the market, but was shipping them to Illinois to some farm to feed. The reason why he asked why he was shipping the stock to market was because the lot was a mixed lot of cattle, some large and some small, and the majority of it rough stock that he did not think fat enough for market. Defendent further told him that he was driving these cattle for another party, that that party had bought them in about Sligo, south of Sligo, he said. He saw the defendant at the stock yards and counted the stock. Walls counted them twice, once about sun-down and then as he loaded them into the cars. There were several other persons present assisting in loading the cars. William Clounts, Herb Crabtree and Bill Redman were there at the time. This man who called himself J. D. Emory was a tall, stout man, and would weigh from 185 to 190 pounds, in his judgment. The cattle were loaded about 12:30 that night. Witness first saw them about sun-down on the evening of the 7th of June. Witness heard this man say that a car load of stock got away from him. In the evening before the cars arrived from Cuba, witness went over to the Jackson saloon and found the defendant there and told him the cars would be in shortly and to be ready to load them, and the next train would take them out. Will Fitzgerald, Will Clounts and Will Redman were in the saloon at the time; they were in an argument over a piece of money that this man Emory gave Clounts. He was shown the piece of money and the witness said it was a fifty-cent gold piece and linked to it was a half dime. Witness identified the defendant Emory Grubb as the man who gave his name to him at Leasburg on the night of the 7th of June, 1904, as J. D. Emory. Witness next saw the defendant in the town of Salem, but he testified that at that time the defendant was wearing a mustache. On cross-examination he testified that the first time he saw the

defendant he was fastening the gate to the stock yards at Leasburg, and he talked with him five or ten minutes. He next saw him when he came to inquire about the cars; Cleary had then gone to supper; he next saw him over at the saloon at the time mentioned, and next saw him out at the stock yards that night when they had lanterns with them, and next when he signed the contract as a witness to the signature.

J. V. Holt testified that he lived at St. James, Missouri, and in June, 1904, was cashier of the bank at that place. He knew Emory Grubb and had known him for at least four years. He was asked if he knew one J. D. Emory, he said he did not, but he knew a man who represented himself to be J. D. Emory. A check marked Exhibit G was exhibited to the witness and he was asked if he had ever seen it before, and he answered that he had, that a party representing himself to be J. D. Emory brought it to the bank. He did not think he could describe the man very accurately, but he was a rather tall man, light-complected, with a heavy mustache, and would weigh 170 or 180 pounds. This man wanted to cash this check and witness told him that he could not cash it for two reasons; one was for want of identification, and the other was that the time lock was on the safe and he could not get at the money before nine o'clock. This man said he could overcome the first objection, and witness told him that would be required and he went out; a few minutes later, he came back with Emory Grubb, the defendant, and Grubb identified him as a stock buyer or shipper, and witness then told him that that was all right, that he would cash the check after nine o'clock. He came in later and got the money and witness placed it to the credit of J. D. Emory. Later J. D. Emory, or the man who represented himself to be J. D. Emory, came in, and the witness's impression was that Grubb came with him, and witness counted him out the cash and

took J. D. Emory's receipt for it.  Emory and Grubb left the bank and that was the last he ever saw of J. D. Emory.  Witness testified that he knew all the stock men around St. James and the country there, but he did not know any man by the name of J. D. Emory. The draft which the bank received was as follows:

"No. 10424 - - - - - -$843.

GREER, MILLS & COMPANY.

*Live Stock Commission Merchants.*

Kansas City, Mo.,        National Stock Yards,     National Stock Yards,
Stock Yards.               St. Clair Co., Ill.            Chicago.

6—8, 1904.

"Pay to the order of Bank of St. James, Missouri, $843.55 (eight hundred and forty-three dollars and fifty-five cents).  The National Bank of Commerce, St. Louis, Missouri.        GREER, MILLS & COMPANY,
(Signed)              "By Wallace Finch.
"Stamped Paid."

The State then offered in evidence the check marked Exhibit H, which is as follows:

"BANK OF ST. JAMES.
"St. James, Missouri, June 9, 1904.
"Pay to the order of self $843.55 (eight hundred and forty-three dollars and fifty-five cents).
"J. D. EMORY.
"Paid June 9, 1904.  St. James, Missouri."

The bond of recognizance given by the defendant for his appearance in this case was identified and offered in evidence for the purpose of showing his genuine signature.  Thereupon, the State offered as a witness Mr. E. F. Dent, who testified that he was in the banking business at Salem, Dent county, Missouri, and had been so engaged for four or five years; that part of his duty was to study signatures and compare hand-

writing. Thereupon, he was shown the signature of Emory Grubb to the recognizance bond and the signature of J. D. Emory to the stock contract and he testified that they were in the same handwriting. The word "Emory" in each, he thought, was in the same handwriting. On cross-examination he was asked if the letter "E" in Exhibit I and the letter "E" in the check, Exhibit H, had any similarity, and he said there was some, but he thought that it was not as much like it as the bond and the shipping contract. He thought to compare the letters "E" alone was not a fair test, that he judged by the word "Emory" in each, and gave it as his opinion that the check had not been signed by the party who signed the bond and shipping contract. The instruments were then submitted to the jurors for their examination.

W. W. Young testified that he was cashier of the bank at Salem and had been for twelve years, and it was a part of his business to make a study of signatures and handwriting. The signature of the defendant Emory Grubb on the recognizance bond, and the signature of J. D. Emory on the shipper's contract, were, in his opinion, of the same handwriting or had been written by the same person, and the check was in a different handwriting. The contract between Bell and Whites and the Glasseys with the Sligo Furnace Company for the pasturage of their cattle for the season of 1904 was offered in evidence.

Thomas Collins testified for the State that in June, 1904, he was in the employment of the defendant Grubb, as a bartender in Grubb's saloon in St. James; that the defendant Asher frequently visited said saloon, and he was well acquainted with both of them. He testified further that both of the defendants conferred with him about their intention to make some money by stealing some cattle. Afterwards, the defendant Grubb was absent from the saloon and the town of St. James for

several days; when he came back, he told Collins he had gotten the cattle and shipped them, but did not get any of the money; he said he got the cattle out of the Sligo pasture and shipped them to St. Louis, where he sold them for something over eight hundred dollars. Grubb said he ran across a fellow at Valley Park and said he told him that he, Grubb, had shipped some cattle to St. Louis, but believed that they were stolen cattle, and that if he, the stranger, would go and draw the money, he would cut it in two with him; that they went to the bank, got the money and the fellow ran off with it and never gave Grubb any of it. He testified that he had a talk with Asher, in which Asher told him of the stealing of cattle and that they were shipped in the name of J. D. Emory. He testified also that one morning, between six and seven o'clock, a man came into the saloon, drank a little and wanted to see the defendant Grubb; after a little talk between them the defendant Grubb and this stranger went over to the bank. Grubb also told the witness that he had identified J. D. Emory at the bank where the check had been cashed, and that this man Emory was named Taylor, and had been a telegraph operator on the railroad. Asher also stated to Collins that Grubb had told him that Emory ran off with all the money and that neither Asher or Grubb got any of it.

On behalf of the defendants, the evidence tended to show that neither of the defendants was in or near Sligo pasture in 1904; that on the 6th, 7th and 8th of June, 1904, defendant Grubb was in St. James working in his saloon; that he did not take said cattle nor ship them to St. Louis. Defendant Grubb admitted that on the 9th of June, 1904, a gentleman appeared at his saloon who called the defendant by name, but that he did not at first recognize him; defendant then remembered that he had met this man at the Cuba fair, and that he told the defendant then that his name was

J. D. Emory. This stranger asked the defendant to identify him at the bank, as he wanted to cash an eight hundred dollar check, and defendant Grubb went with him for that purpose.

Defendant Grubb further testified that he did not pass Mr. Conway's on the evening of the 6th of June, 1904, and did not stop at Mr. Parrott's that evening with a drove of cattle; that he never was at Parrott's farm, and did not know where it was, and never had any of the conversations with Parrott, his wife and son that they detailed on the stand. Denied that he signed the name of J. D. Emory to the shipping contract, or that he knew who did sign the same. He testified that he had signed the bond for his appearance in court in this case. Denied that he ever saw Mr. Cleary, the agent at Leasburg, or Ernest Walls. He admitted that he knew the witness Collins and that Collins had sometimes worked for him at his saloon at St. James, but denied all the statements made by Collins with reference to the larceny of the cattle.

On the part of defendant Asher, the evidence tended to show that he was living, at the time of the alleged larceny, on a farm fourteen miles from St. James, and that on the 6th of June, 1904, he drove into St. James in a wagon in company with some friends, spent the day at St. James and returned home after dark, and on the next day he rode horse-back, in company with George Grubb, to St. James, and spent most of the day in that town, returning home after dark. There was also evidence to the effect that defendant Asher enjoyed a good reputation for honesty and integrity prior to the commission of this crime. The defendant called a number of witnesses who testified that the reputation of Collins, the State's witness, for honesty, truth and veracity was bad. Defendant also introduced evidence in support of the alibi of both the defendants.

Herbert Hughes, called as a witness for the de-

fendant, testified that he worked in the livery stable for
Herman Essman on June 14, 1904, and Asher was not
with Grubb when he got the horses. He was asked in
regard to the conversation he had with Ashley Harri-
son, the prosecuting attorney of Crawford county, in
September, and asked if he did not state that the
defendant Emory Grubb did not get the horses from
Essman on the 20th of June, 1904, but he got them along
about the first part of June, and answered that he did
not. He testified that he had been working for the
defendant's brother since the filing of the informa-
tion in this case.

Mr. Harrison was called by the State in rebuttal,
and he testified that in September, 1905, Herbert
Hughes stated to him that it was the 5th or 6th of
June, 1904, when the defendant hired the horses at
Essman's livery stable.

The State also introduced evidence of the witness
Collins' neighbors, tending to prove that his reputation
for truth and veracity in the neighborhood in which
he lived was good.

The exceptions of the defendants to the exclusion
and admission of evidence will be noticed in the dis-
cussion of those exceptions in the course of the opin-
ion.

I. The circuit court did not err in refusing the
request of the defendants to stop the trial in Dent
county and transfer the cause to Crawford county, as
may be done in a proper case under sections 2414 and
2415, Revised Statutes 1899. The fact that the stolen
cattle were shown to have been in the possession of
the defendants in Crawford county did not negative the
irresistible inference that they were in the Sligo pas-
ture in Dent county when they were taken by the de-
fendants; all the testimony tended to prove that this
pasture was wholly within Dent county and that it was
inclosed with a barb-wire fence, which was kept in good

condition and inspected two or three times a week, and when the cattle were first seen in the possession of the defendants in Crawford county, they were being driven by them from the direction of this pasture and the tracks of two horses corresponding to those ridden by the defendants were afterwards found at the gap, which had been cut through the wire fence. There was absolutely no proof that the wire fence was down and insecure and that the cattle were breechy and had been seen wandering in Crawford prior to the time they were stolen. The question of venue is always a question of fact to be proved like any other fact and the jury in this case had ample evidence from which to find, and they did find, that the defendants took, stole and carried away the cattle in Dent county. [State v. Pennington, 124 Mo. 388; State v. Burns, 48 Mo. 438; State v. Chamberlain, 89 Mo. 129; Underhill on Crim. Ev., sec. 36.]

II. There is no merit in the contention that the court erroneously permitted Cleary, the station agent at Leasburg, to relate the conversation he had with the defendant Grubb, in which Cleary asked him why he did not use all three of the cars, and defendant answered that he had three car loads but one car load of the cattle stampeded and got away from him. No ground is assigned in this objection and we have been unable to discover any reason why this evidence should have been excluded.

III. Equally without merit is the point that the court erred in permitting William Corkran and George W. Ives to testify that neither of them sold any cattle to J. D. Emory or defendant Grubb. The evidence had already tended to prove that the defendants had told Mr. Parrott and his son Reuben that he had bought these cattle from Mr. Corkran and had told the parties at Leasburg that he got some of them from Ives. It was entirely competent to show that these statements

of the defendants were fabrications upon the familiar principle that falsehood is a usual concomitant of crime. When one is found in possession of stolen property recently after it has been stolen, he is called upon to explain his possession, and if he gives false, incredible and inconsistent accounts of how he acquired it, it is a damaging circumstance against him; that such explanation can be shown to be false by the party from whom he claims to have purchased, is too clear for discussion.

IV.  Neither was there any error in the action of the circuit court in allowing the State to prove by Mr. Holt, the cashier of the St. James Bank, that he knew all the stock men in that section and did not know any such a man or stock man as J. D. Emory in that region.  No reason was assigned for this objection and it might well be dismissed on that account from further consideration, but it was clearly competent in connection with the defendant's conduct in identifying this stranger as J. D. Emory, when, according to his own testimony, he had never seen the individual but once before and had never been introduced to him, and he did not know him when he appeared at his saloon on the morning that the draft was collected and in connection with the further testimony of Collins that the defendants had stated that this stranger was, in fact, named Taylor.

V.  Error is assigned on the action of the circuit court in permitting the expert witnesses and the jurors to compare the handwriting on the shipping contract and the recognizance bond with the check signed by the person whom the defendant Grubb identified as J. D. Emory.  By reference to the statement, it will appear that when the witnesses Dent and Young were on the stand, they gave it as their opinion that the signature of the live stock contract, Exhibit E, and the

signature to the recognizance bond, Exhibit I, were in the same handwriting. Counsel for the State did not submit to them whether the signature to the check, Exhibit H, was in the same handwriting as that of the two other papers, but on cross-examination defend-. ant's attorney asked the witnesses to compare the signature to the bond with that to the check, and it was then and then only that they gave their opinion that the signature to the bond was different from that to the check, or Exhibit H, so that if any error was committed in permitting a comparison of the signature on the bond to that on the check, it was invited by the defendants themselves. Having called the jury's attention to that question, they cannot complain if the counsel for the State further interrogated the witnesses along the same lines. [State v. Hamey, 168 Mo. l. c. 197; State v. Palmer, 161 Mo. l. c. 175.]

VI. Again, it is urged that the court improperly restricted the impeachment of the witness Collins to his reputation for truth and veracity and excluded the question as to Collins' reputation for being a dead-beat. The record discloses that the court permitted the defendant to impeach the witness Collins' reputation for honesty as well as for truth and veracity by a large number of witnesses, and indeed without objection on the part of the State permitted these witnesses to testify that Collins was a man who would not pay his debts and had been accused of stealing and that he frequented saloons and got drunk and gambled. While we think that the court properly excluded the question as to his being a dead-beat, the record abounds in evidence tending to show that he had all the characteristics of a dead-beat. There is no merit in this contention.

VII. It is also insisted that the court erred in permitting counsel for the State to travel outside of the record over the objections of the defendants without rebuke from the court. It appears from the bill

of exceptions that the most of these objections were
trivial, and in a number of cases when they were made
the counsel for the State at once made the correction,
and in others the court rebuked the counsel, and called
their attention to what the evidence really was and
admonished them to state the testimony as the wit-
nesses had given it. The most important of these state-
ments by counsel for the State would seem to be that
of Mr. Cope, who in his argument said, "Here is Her-
man Essman, a witness for the State, he knew Emory
Grubb, and he says Emory Grubb got two horses from
him at his stable in Steelville to go to Sligo. It is a
strange thing to me, gentlemen of the jury, that this
Steelville trip has not been explained to you." This
statement was objected to on the grounds, first, that
it was not supported by evidence, and, second, because
it was a reference by counsel to the failure of the de-
fendants to testify. In an affidavit filed by Mr. Cope
in opposition to the motion for a new trial, he denies
making this statement, but, accepting it as made, it is
evident that the first ground is without any basis, be-
cause Essman did testify that he knew the defndant
and during the month of June, 1904, he was in the
livery business in Steelville, and the defendant Grubb
and another man drove into Steelville in a rig, which
they sent back, and the defendant applied to him for
two saddle horses to go to Sligo, saying that he wanted
them for three days, and that he hired them the
horses and they kept them until one o'clock of the morn-
ing of the third day. As to the second objection to
this statement, clearly it could not have been to the
failure of the defendants or either of them to testify,
because they both testified in their own behalf, as
stated by their counsel in their brief to this court, "as
to the facts involved in the whole case." It is true
that neither of the defendants explained this trip to
Steelville and the hiring of the horses from Essman

and the statement of Grubb that he wanted them to go to Sligo, but it does not follow that the counsel for the State could not discuss this evidence and point out the failure of an explanation as to where they went on this trip with these horses, or what their mission was, without being charged with referring to the failure of defendants to testify. In State v. Kelly, 73 Mo. 608, the case was one for larceny and the court instructed on the presumption arising from the recent possession of stolen property in this form: "Where property has been stolen, and recently thereafter the same property, or any part thereof, is found in the possession of another, such person is presumed to be the thief, and if he fails to account for his possession of such property in a manner consistent with his innocence, this presumption becomes conclusive against him." The learned counsel for the defendants in that case assailed that instruction on the ground that, in view of the fact that the defendants were permitted to testify, the jury might construe this phraseology to imply that the defendant himself must explain, and that nothing else could do so, but this court said: "It is difficult to conceive how the jury could have been misled by the words, 'If he fails to account for his possession of such property in a manner consistent with his innocence.' That portion of the instruction makes no reference to the defendants, as individuals, or to their having testified in the cause, but merely states the abstract rule of law applicable, as already seen, to all cases of possession of property recently stolen." The testimony had shown that these two defendants appeared at the house of Mr. Parrott about sun-down on the evening of the 6th of June, 1904, riding two horses answering the description of Essman's horses and driving cattle with the brands and marks of the cattle that were stolen from the Sligo pasture, and of the same colors and all dehorned, and it

had been shown by Essman that the defendants in June had got two horses answering to the description of those ridden by the defendants that day and to be used for three days and were not returned until the morning of the third day. To say that counsel for the State, with all these incriminating facts tending to show the theft of the cattle and the possession of them at sun-down on the evening of the 6th of June by the defendants, should not be allowed to argue that these facts called for an explanation by the defendants of the time when they hired the horses from Essman, and the place to which they went, would be announcing the rule that counsel for the State are no longer permitted to make a logical argument and discuss incriminating facts to a jury, because of section 2638, Revised Statutes 1899, which provides: "If the accused shall not avail himself or herself of his or her right to testify, . . . it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt, nor be referred to by attorney in the case, nor be considered by the court or jury before whom the trial takes place." That section, in our opinion, was never intended to prohibit, nor did it have the effect of prohibiting, a court having criminal jurisdiction from instructing a jury as to the presumption arising from the recent possession of stolen property, nor to deprive counsel for the State of arguing the effect of the failure by defendants charged with larceny to explain the possession of stolen property recently after it had been stolen. In our opinion, if Mr. Cope made the statement attributed to him, he did not violate the prohibition of the statute, but was entirely within the scope of a legitimate discussion of the evidence in the case.

VIII. As to the assignment of error based upon Mr. Elmer's argument, it appears that at the suggestion of the court he corrected two of the statements

made by him when his attention was called thereto, and was rebuked by the court to his reference to Mr. Knox whom the defendant Grubb said he went to see on that day. We find nothing in the remarks of either counsel, when considered with the corrections made by them and the action of the court thereon, which call for a reversal of the judgment.

IX. While the defendants objected to all the instructions given by the court and to the refusal of two asked by themselves, they have assigned no error on that account in their brief and argument in this court, but we have carefully examined the same and found that they cover every proposition of law arising upon the evidence and leave nothing to be desired. They were as favorable to the defendants as they could ask. Having patiently gone through all of the alleged errors, in our opinion there is no reversible error in the record, and the judgments and sentences of the defendants must be and they are affirmed.

*Burgess, P. J.,* and *Fox, J.,* concur.